(Nos. 18686, 18761.—

JOHN P. OLIN *et al. vs.* GEORGE W. REINECKE *et al.* Plaintiffs in error.—(CHARLES G. MELIN *et al.* Defendants in Error.)

*Opinion filed October 19, 1929—Rehearing denied Dec. 4, 1929.*

Hoag & Ullmann, (George M. Burditt, of counsel,) for plaintiffs in error.

Arthur H. Chetlain, for defendants in error.

Mr. Commissioner Partlow reported this opinion:

John P. Olin, Hilma Olin, Charles G. Melin and Augusta S. Melin filed a bill for relief in the circuit court of Cook county against George W. Reinecke and Harold J. Gilmore. Upon issue being joined the cause was referred to a master to take the evidence and report his conclusions of law and fact. The master made his report recommending a decree granting relief. Exceptions to the report were overruled and a decree was entered as recommended. An appeal was prosecuted to this court and the cause was transferred to the Appellate Court for the First District on the ground that a freehold was not involved. (*Olin* v. *Reinecke,* 322 Ill. 449.) The Appellate Court reversed the decree and remanded the cause with directions, and the case comes to this court upon a writ of *certiorari.*

The death of Hilma and John P. Olin having been suggested, this court granted leave to their representatives to be substituted as defendants in error.

The bill alleged that in April, 1921, Olin purchased lot 33, in block 22, in Southfield subdivision to Chicago; that by mistake he improved lot 34, in block 22, in that subdivision; that he conveyed lot 33 and the improvements

to Melin in March, 1922; that Reinecke purchased lot 34, in block 22, in June, 1922, and took title in the name of Gilmore; that the purchase was in pursuance of a conspiracy to defraud defendants in error of their equitable rights in lot 34. The bill prayed for an accounting; that Gilmore be required to convey lot 34 to Melin in exchange for lot 33, or that he be required to convey lot 34 to Melin upon payment to him of its fair value exclusive of the improvements, or of its purchase price, with interest, or that he be required to pay Melin the fair value of the improvements on lot 34. Reinecke disclaimed any interest in the property. Gilmore demurred to the bill, and the demurrer was overruled. He then filed an answer, in which he denied all notice and conspiracy, alleged his purchase of an outstanding contract of sale for lot 34, the payment of the purchase price, the receipt of a deed, and he claimed ownership of lot 34, together with the improvements. The decree ordered Gilmore to pay to the master $12,565.22, (the value of the improvements,) together with costs, within thirty days. In default of this payment it was ordered that lot 34, and the improvements thereon, be sold at public sale and the proceeds distributed, first, to the payment of the costs and expenses of the sale; second, to the payment to Gilmore of $4500, the present value of lot 34, unimproved; third, to the payment of $6000 and interest to the holder of the mortgage notes on the property, and that the difference between the mortgage indebtedness and $12,565.22 and the costs, if any, be paid to Melin. The Appellate Court found that the rights of the parties would be more equitably preserved by Melin conveying to Gilmore lot 33 and Gilmore conveying to Melin lot 34; that the mortgage on lot 33 be transferred to lot 34; that the parties execute conveyances, and in default thereof the conveyances be executed by the master. The decree of the circuit court was reversed and the cause remanded, with directions to enter a decree as specified.

It is insisted by plaintiffs in error that Olin by constructing the improvements on lot 34, to which he had no title, did not acquire any equitable interest in lot 34; that in order to establish an estoppel, defendants in error were required to show that Bruening, who had a contract for the purchase of lot 34, was obliged to speak and that he did not speak; that Gilmore succeeded to all of the rights of Bruening; that the chancellor was in error in decreeing that defendants in error were entitled to a lien on lot 34 for the cost of the improvements, and that upon the failure of Gilmore to pay that amount that lot 34, with the improvements, be sold; and that the Appellate Court was in error in directing the entry of a decree requiring Gilmore to surrender lot 34 and take lot 33 in exchange.

It is insisted by defendants in error that Olin, by constructing the improvements on lot 34, although he had no title to the lot, acquired an equitable interest in that lot as against plaintiffs in error. The basis of this argument is, that actual occupancy of land is notice of all legal and equitable claims of the owner, and that Olin, with his improvements, was in possession. It is insisted that Melin, as the successor in title to Olin, had an equitable interest in lot 34 and in the improvements thereon; that before Olin placed the improvements on the lot he employed an experienced licensed surveyor to locate the lines of lot 33; that in order to establish an estoppel defendants in error were not required to show that Bruening was under obligations to speak; that Gilmore did not succeed to all of the rights of Bruening under his contract; that Reinecke and Lane were agents of the owners, and the court should have found that Reinecke had actual knowledge of the improvements and that he should have known that Olin was placing the improvements on the wrong lot; that Reinecke and Gilmore made no objections or protests, and they were therefore estopped from claiming any right or title to the improvements; that Reinecke, as the agent of the owners, contributed to the error

of Olin's surveyor by having the figures "33" stamped on the sidewalk in front of lot 34; that Reinecke pointed out lot 34 and gave Olin a receipt for lot 33 and the owners delivered to Olin a deed for lot 33, therefore Olin was led to believe that the deed was for the lot which he bought. It is also insisted that the decree should have found that Reinecke and Gilmore conspired to defraud Olin of his rights in lot 34, and by so doing they were guilty of such actual fraud as entitled defendants in error to relief.

The general rule at law is, that if a stranger enters upon the land of another and makes an improvement by erecting a building the building becomes the property of the owner of the land. (*Dooley* v. *Crist,* 25 Ill. 453; *Mathes* v. *Dobschuetz,* 72 id. 438; *Crest* v. *Jack,* 3 Watts, (Pa.) 238; I Hilliard on Real Prop. 5.) In equity, however, if the owner stands by and permits another to expend money in improving his land he may be compelled to surrender his rights to the land upon receiving compensation therefor, or he may be compelled to pay for the improvements. In such cases there is always some ingredient which would make it a fraud in the owner to insist upon his legal rights. Such an ingredient may consist in the owner encouraging the stranger to proceed with the improvement, or where one party acts ignorantly and without the means of better information and the other remains silent when it is in his power to prevent the expenditure of the money under a delusion. It has been held in such cases that to permit one to take advantage of the mistake of another would be revolting to every sentiment of justice. (*Clark* v. *Leavitt,* 335 Ill. 184; *Loughran* v. *Gorman,* 256 id. 46; *Bright* v. *Boyd,* I Story, 478; 2 Pomeroy's Eq. Jur. sec. 807; Bigelow on Estoppel, sec. 818; Story's Eq. Jur. 490.) The exercise of such a judicial power, however, unless based upon some actual or implied culpability on the part of the party subjected to it, is a violation of constitutional rights. (*Kirchner* v. *Miller,* 39 N. J. Eq. 355.) An error which

is the result of inexcusable negligence is not such an error as equity will relieve. *Haggerty* v. *McCanna*, 25 N. J. Eq. 48.

In Pomeroy's Equity Jurisprudence (vol. 2, sec. 867, p. 1782,) it is said: "Now, the effects of a pure mistake upon the rights of the suffering party are the same as injuries and call as loudly for relief as those of fraud. Furthermore, although in the original mistake there is no element of immorality, yet afterwards, when the mistake is discovered and the party benefited insists upon retaining the advantages and refuses to voluntarily correct the error but plants himself upon the strict legal rights which the erroneous writing gives him, there is a very shadowy distinction between the immoral character of his conduct and that of the person who intentionally, by means of representations and concealments, induces another to enter into an agreement; and for this reason we find judges constantly describing the conduct of persons in such a situation, who insist upon holding the advantages accidently obtained by mistake, as fraudulent, and the persons themselves as guilty, from a moral point of view, of virtual, if not actual, fraud."

In *Pearl* v. *Thorp*, 17 S. D. 288, 96 N. W. 99, the township of Pearl desired to sink an artesian well on a two-acre tract which it owned. It had the land surveyed and the surveyor drove a stake to indicate where the well was to be sunk. Some unknown person removed the stake and placed it upon adjacent land owned by Nelson, nineteen feet from the two-acre tract. Nelson immediately sold his land to Thorp, and the well was sunk at a cost of $2300. The township brought suit against Thorp to obtain relief in equity from the consequences of a mutual mistake. The court granted the relief, and the decree required Thorp to reimburse the township for the cost of the well, or to convey to the township, within a reasonable time, the one-half acre of ground upon which the well was situated.

In *McKelway* v. *Armour*, 10 N. J. Eq. 115, the complainant erected a dwelling house by mistake on the land of the defendant. The defendant lived in the vicinity and saw the complainant making the improvements from day to day but did not suspect the erection to be on his lot until after it was completed. A bill was filed for relief. The relief was granted and the decree provided for the payment for the improvements or the sale of the land and a distribution of the fund. The court said: "But it is proved, beyond all doubt, that the complainant erected his improvement on this lot by mistake. He supposed that it was the lot next, that belonged to Armour. Armour labored under the same mistake. He lived in the vicinity. He saw the complainant progressing, from day to day, with these improvements. If he knew this to be his lot his silence was a fraud upon the complainant. But this is not pretended. He admits that he did not suspect the erections to be on his lot until some time after their erection, when by actual measurement, to his surprise, he discovered the mistake. Under such circumstances it would be most unjust to permit Armour to take these improvements and to send the complainant away remediless."

These last two cases are criticised by plaintiffs in error and many cases are cited by both parties on the questions involved. The law is well settled, but the difficulty arises from the application of the law to the particular facts of each case. Sometimes one or two facts in a case distinguish it entirely from other cases which are cited in favor of its holdings or contrary thereto. In the case at bar the first error was made by the owners of the land when the subdivision was laid out. They undertook to stamp in the cement sidewalk in front of each lot its number as shown on the plat. Lots 33 and 34 were on the east side of a north and south street. Lot 33 was south of lot 34. The number "33," as stamped in the sidewalk, was not in front of lot 33 but was 1.72 feet north of the south line of lot 34.

The number "32" was .82 of a foot north of the south line of lot 33. The number "34" was 1.02 feet north of the south line of lot 35. The number "40" was in front of lot 40. There were very few, if any, buildings erected at the time of the sale. There were no buildings from lot 30 north to lot 40. There were no monuments indicating the corners of lots and no markings or visible lines between the lots marked on the sidewalks or otherwise. It was therefore very easy for a person to be mistaken as to the location of a lot.

In 1915 Russell Tyson and Arthur Lyman, as trustees of the owners, held the record title to all lots in the subdivision. William E. Harmon & Co. in 1920 were the agents of the owners in the sale of these lots. Herbert O. Lane was a salesman for Harmon & Co. Reinecke was a real estate agent with an office near the subdivision. He was familiar with the lots in the subdivision and had tried to sell some of them. The method of doing business was to sell the lots on contracts, with a few dollars down and with small monthly payments for the balance. After a lot was sold on a contract it is apparent that the duties of Harmon & Co. did not cease with reference to that particular lot but they continued to offer it for sale to other parties. If a sale was consummated the original contract of sale was assigned to the new purchaser and a deed was executed to him by the trustees. On January 18, 1916, lot 34 was sold upon a contract of this kind to Dick Bruening for $1090. Ten dollars was paid in cash and $11 was to be paid on each succeeding month. The contract was not filed for record. Lot 33 was sold under a similar contract to one Walther. After these two sales Lane listed some of these lots, including lots 33 and 34, with Reinecke for sale. Under the facts in evidence, Harmon & Co., Lane and Reinecke were the agents not only for the holders of the record title but they were also the agents for Bruening and Walther, who held contracts for the purchase of lots 33

and 34. Olin wanted to buy a lot and he made application to Reinecke. In December, 1920, they went to the subdivision and looked at various lots. Reinecke told Olin that lot 33 was for sale for $1075, and Olin said he would take it. There can be no question, under the evidence, that the lot which Reinecke showed Olin was the lot which had the number "33" stamped in the sidewalk in front of it. This was lot 34 and not lot 33, which both Olin and Reinecke thought was being sold. If Reinecke was the agent of the holders of the record title and of the holders of the two contracts of sale, then all parties concerned were mistaken with reference to the lot which Olin agreed to buy and which was later conveyed to him by the trustees, and all of the parties were responsible for the mistake. Reinecke reported to Lane that Olin wanted to buy lot 33, and Olin deposited $100 with Reinecke and took a receipt for the payment on lot 33. On April 9, 1921, Walther assigned his contract to Olin, and a deed was executed to Olin and wife, as joint tenants, by Tyson, trustee, which deed was recorded on April 27, 1921. Olin then listed lot 33 with Reinecke for sale but no purchaser was secured. Olin decided to improve the lot. Lane testified that he told Olin when he bought the lot that when he was ready to build he had better have the lot surveyed. He testified that he told every purchaser to have a survey made. Olin employed Augustus Cavanna to survey lot 33 before the buildings were erected. Cavanna's survey and plat erroneously showed lot 33 to be the lot in front of which the number "33" was stamped on the sidewalk. After the survey Olin entered into possession of lot 34 and has been in possession since that time. He erected a brick house and garage costing $12,565.22 on the lot which he supposed was No. 33 but which was, in fact, lot 34. The evidence shows that both Lane and Reinecke visited the premises while these buildings were being erected and they both knew that the buildings were being built by Olin. Reinecke also knew,

or should have known, that the buildings were being erected on the lot which he showed to Olin, which lot was lot 34, and that lot 33 had been conveyed to Olin. Both of them knew, or should have known, that the buildings were being erected on the lot which had the number "33" stamped in the sidewalk in front of it. After the buildings were erected Olin borrowed $6000 and executed a trust deed conveying lot 33 to Nelson, as trustee. On March 14, 1922, Olin and wife conveyed the premises to Melin and wife for a stated consideration of $14,000. On March 16, 1922, the registrar of titles issued a certificate of ownership of lot 33 to Melin and wife.

In June, 1922, Reinecke asked Lane what lots he had for sale, and Lane told him he had lot 34. At that time some of the lots were priced at $1700 but lot 34 was priced at $1600. In 1921 and 1922 Gilmore was a salesman for Hart, Schaffner & Marx, in Chicago. He is a brother-in-law of Reinecke. He talked with Reinecke about buying a vacant lot in Southfield, on which he said he wanted to erect a flat-building. He had only a few dollars in the bank and owned some Hart, Schaffner & Marx stock. In the spring of 1922 Reinecke showed Gilmore ten or twenty vacant lots, including two or three vacant lots in Southfield. Gilmore authorized Reinecke to purchase lot 34 for him. It is very apparent from the evidence that when Reinecke and Gilmore looked at lot 34, if they did look at it, they saw it had a house upon it which had been built by Olin. Olin was in possession of the lot at that time and the house had been completed. This was sufficient to put both Reinecke and Gilmore on notice that Gilmore was not buying a vacant lot when he bought lot 34. If they did not look at lot 34 they must have looked at some vacant lot which Gilmore did not buy. Gilmore did not intend to buy a lot with a house on it but intended to buy a vacant lot. Reinecke telephoned Lane that he had a deposit on lot 34 and asked him to prepare a deed. Lane called

Bruening, who owed $400 on his contract. Bruening assigned his contract to Gilmore. On June 6, 1922, Lyman, as trustee, executed a deed conveying lot 34 to Gilmore, and the deed was recorded on the same day. Gilmore did not have sufficient money to pay for this lot, and he assigned his Hart, Schaffner & Marx stock to his father, and the father is supposed to have made the payments. Bruening testified that he saw lot 34 twice during the time he held the contract, the last time being in 1920, and that there were no improvements upon it except the sidewalk in front of it, and that he did not know until just before the trial that there were any improvements on the lot. In July, 1922, Gilmore had the property surveyed, and claims to have discovered that the buildings erected by Olin were on lot 34 instead of lot 33, and he notified Olin. The surveyor who made the mistake offered to pay $500 to correct the error, but Gilmore refused the offer. Olin and Nelson offered first $1000 and then $2000 to correct the error, but the offers were refused. Gilmore refused to make any compromise, claimed that the buildings were his, and the bill was filed for relief.

The whole difficulty in this case may be attributed to the error of the owners of this subdivision in stamping the wrong numbers on the sidewalk. The salesman evidently sold the lots according to the erroneous numbers. The fact that Lane told Olin to have his lot surveyed indicated that the owners and salesmen were not certain as to the numbers of the lots. It is not unreasonable to assume that the contracts of Walther and Bruening did not call for the lots which they were supposed to have bought. Olin was not guilty of willfully, or even carelessly, building on the wrong lot. The surveyor should have located the right lot, but he was probably led into error by the number on the sidewalk. Any error committed was chargeable against the holders of the record title and their agents and servants. Bruening never held the legal title to lot 34. His contract

was not on record and he was not in possession. He had no equitable interest of which Olin had notice. He never consummated his contract. No deed was ever predicated on the contract. He received full value for all of his interest. Gilmore did not acquire title from Bruening but acquired title directly from the owners. The failure of Bruening to know anything about the erection of this building is not material. It is difficult to believe that Reinecke did not know that Olin had built on the wrong lot. The actions of Gilmore and Reinecke are consistent with such knowledge. Gilmore had very little money, and yet he purchased the lot, as he says, with the intention of erecting a flat-building upon it, which would cost a considerable amount of money. When the mistake was discovered he and Reinecke stood upon their legal rights, refused to accept any compromise and exhibited a determined intention to obtain something for nothing. The evidence shows that Olin was entitled to a decree as prayed. He was either entitled to purchase lot 34 at its reasonable market value or to obtain from Gilmore the value of the improvements put thereon.

We do not agree, however, with the judgment of the Appellate Court as to the provisions of the decree directed to be entered. Under the authorities Gilmore should be decreed to pay the reasonable value of the improvements placed on lot 34. In case of his failure or refusal to do so the property should be sold and the proceeds distributed as decreed by the chancellor.

The judgment of the Appellate Court will be reversed and the decree of the circuit court will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*